# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | Sidney I. Schenkier |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4147 | **DATE** | 9/10/2003 |
| **CASE TITLE** | Erron Humphrey, et al. vs. International Paper, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER REPORT AND RECOMMENDATION.** The Court respectfully recommends that the district judge deny the plaintiffs' motion for class certification [doc. # 40-1] on the grounds that the numerosity element of Rule 23(a)(1) has not been satisfied and that the class vehicle is not superior to individual determinations. Specific written objections to this report and recommendation may be served and filed in writing within ten (10) business days from the date that this order is served. Fed.R.Civ.P.72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| ✓ | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| ✓ | Copy to judge/magistrate judge. |

courtroom deputy's initials JJK

number of notices

SEP 11 2003

date docketed

docketing deputy initials

9/10/2003

date mailed notice

JJK

mailing deputy initials

U.S. DISTRICT COURT
CLERK
03 SEP 11 AM 8:04
FILED FOR DOCKETING

Date/time received in central Clerk's Office

**Document Number**

74

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ERRON HUMPHREY, TYRONE THOMAS, )
THEODIS JONES, TOMMY LOVE, )
LEROY MYLES, WILLIAM ROBINSON, )
DEVIN BAXTER, PERCY JONES, )
EDWARD BOBO AND DWAYNE HANNAH, )
on behalf of themselves and others similarly )
situated, )
                          )
           Plaintiffs, )     No. 02 C 4147
                          )
vs.                           )     District Judge Guzman
                          )
INTERNATIONAL PAPER and PAPER, )     Magistrate Judge Schenkier
INDUSTRIAL, CHEMICAL AND ENERGY )
WORKERS INTERNATIONAL UNION, )
LOCAL 1216, )
                          )
           Defendants. )

DOCKETED
SEP 1 1 2003

## REPORT AND RECOMMENDATION

The named plaintiffs are (with one exception) former employees of defendant International Paper; defendant Industrial, Chemical and Energy Workers International Union ("PACE"), Local 1216 ("PACE-Local 1216," or "Local 1216") is the union that represents production and maintenance employees at International Paper's Chicago facility. On June 10, 2002, the named plaintiffs filed a class-action complaint; they then amended their complaint on October 18, 2002. The defendants have answered. Counts I through IV of the complaint allege class-wide racial harassment, discrimination, discriminatory layoffs, and retaliation, while the remainder of the 58-page complaint brings various, individual claims by the named plaintiffs. The proposed class claims are as follows:

- Count I alleges a pattern and practice of racial harassment due to "inferior terms and conditions of employment" (Am. Compl. ¶¶ 74-124).

- Count II alleges a pattern and practice of race discrimination in "hiring, promotions, compensation, work assignments, discipline and other terms and conditions of employment" (Am. Compl. ¶ 125-155).

- Count III alleges a pattern and practice of racially discriminatory layoffs (Am. Compl. ¶¶ 156-168).

- Count IV alleges class-wide retaliation by International Paper (Am. Compl. ¶¶ 169-183).

The named plaintiffs have moved for class certification on the claims alleged in Counts I-IV of their amended complaint under Federal Rule of Civil Procedure ("Rule") 23 (doc. # 40). The plaintiffs have proposed the following two class definitions for certification:

a. All African-Americans that were or are employees of International Paper, Chicago area facility on or after 1999 to the present.

b. All African-Americans that were or are members of Paper, Allied-Chemical and Energy Workers International Union, Local 1216 on or after 1999 to the present.

(Pls.' Motion for Class Certification ("Pls.' Mot.") at 1-2). For the reasons set forth below, this Court respectfully recommends that the district judge deny class certification to the plaintiffs.

## I.

We begin with a brief statement of the factual history and allegations in this case, which determine the time frame relevant to the Rule 23 determination.

In early 2000, International Paper had two facilities in the Chicago area: one in Northlake, Illinois, and one in the City of Chicago.

Production and maintenance employees, who are paid on an hourly basis, were represented by PACE-Local 1210 at the Northlake facility, and by PACE-Local 1216 at the Chicago facility. PACE Local 1210 has no presence at the Chicago facility; PACE Local 1216 had no presence at the

Northlake facility. Supervisory employees (who are salaried) at the Northlake and Chicago facilities were not members of PACE-Locals 1210 and 1216, respectively.

All of the named plaintiffs were hourly employees who originally employed at Northlake facility, which closed in May 2000. Prior to this closing, on April 18, 2000, PACE-Local 1210 and International Paper entered into a Closure Agreement; pursuant to that agreement, Local 1210 and International Paper Company agreed that "the closure . . . will result in the termination of all employees covered by the Labor Agreement" (Pls.' Dep. Ex. 28). The Closure Agreement also provided that "[e]mployees who express an interest in other International Paper locations will be instructed on how to submit an application and will be given preferential hiring rights" (*Id.*).

International Paper informed the employees at its Northlake facility of International Paper's intention to expand the Chicago facility, and invited the terminated Northlake employees to apply for those new positions. A number did so. In May 2000, IP-Chicago hired approximately 26 former Northlake hourly employees at its Chicago facility – including 15 hourly African American employees, 10 of whom are the named plaintiffs in this action (Defs.' Exs., Egeland Dep., Pls.' Ex. 25).

On May 11, 2000, International Paper and PACE Local 1216 entered into an agreement which provided, *inter alia*, that the former Northlake employees would be considered new hires with new seniority dates of May 22, 2000 for competitive purposes (such as bidding for particular jobs or shifts), but would retain their company seniority accrued while at the Northlake facility with respect to vacation and pension benefits (Pls.' Dep. Ex. 28). Chicago facility employees became members of Local 1216 after a 90-day probationary period.

On November 30, 2001, the Chicago facility laid off 18 hourly employees in accordance with the competitive seniority system, including eight of the named plaintiffs, because of a significant reduction in business volume. In all, 13 of the 18 persons laid off were African-American; four were Hispanic; and one was Caucasian.

The named plaintiffs allege that after coming to the Chicago facility, they were subjected to a pattern and practice of racial harassment and discrimination by International Paper against African American employees. This alleged conduct included offensive racial comments and graffiti; and discrimination in job assignments, promotions compensation, discipline and other terms and conditions of employment. In addition, the named plaintiffs who were still employed at the Chicago facility as of November 2001 (which is all of the named plaintiffs except Devin Baxter and Percy Jones) allege that they were laid off on November 2001 in retaliation for making complaints about harassment and discrimination. The named plaintiffs claim that Local 1216 is liable for this conduct because it stood silent, and did not take action to protect African American employees at the Chicago facility from this harassing and discriminating conduct.

## II.

To obtain class certification under Rule 23, a plaintiff must satisfy all four elements of Rule 23(a). If each of those elements are satisfied, then the plaintiff must satisfy one of Rule 23(b)'s requirements. *See Jefferson v. Security Pacific Financial Services,* 161 F.R.D. 63, 67 (N.D. Ill.1995); *Chandler v. Southwest Jeep-Eagle, Inc.,* 162 F.R.D. 302, 306 (N.D. Ill. 1995). A party seeking class certification bears the burden of proving that each of these requirements under Rule 23 has been met. *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 162 (1982) (Burger, C.J., dissenting) (dissent agreed with majority on principle cited but disagreed with majority's

4

application). Failure by the plaintiff to satisfy any one of these prerequisite elements precludes certification. *Retired Chicago Police Ass'n. v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993).

To determine whether the requirements of Rule 23(a) and (b) have been satisfied, the Court must examine the factual basis for a plaintiff's claims. When making that factual inquiry, the Court must reconcile two lines of authority that, while perhaps facially at odds, are indeed in harmony.

The Supreme Court has made it clear that the propriety of class certification is a separate issue from whether the plaintiff will ultimately prevail on the merits of certain claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974) ("nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"). A meritorious claim may be denied class certification if it does not satisfy Rule 23; and, conversely, non-meritorious claims may be resolved adversely to the plaintiffs after a court certifies a Rule 23 class, resulting in a *res judicata* effect on the class. *See Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995). Thus, while the "boundary between a class determination and the merits may not always be easily discernible," *Retired Chicago Police Ass'n,* 7 F.3d at 599, (quoting *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F2d 890 (7th Cir. 1981)) because the Court's certification decision depends on factors "enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *id.* at 598, (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463 (1978)), it nonetheless is a boundary that must be respected.

At the same time, the Seventh Circuit recently has commented that, unlike a motion to dismiss, where a plaintiff's factual allegations are accepted, "the proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be

found in Rule 23 and has nothing to recommend it." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir.), *cert. denied*, 534 U.S. 951 (2001). The Seventh Circuit explained, for example, that a court would not be free to accept an allegation of 10,000 class members for purposes of numerosity, in the face of a dispute on that point. *Id.*, at 676. The Court of Appeals also explained that where the question of suitability for class treatment overlaps with a question related to the merits, the district judge "must make a preliminary inquiry into the merits." *Id.*

We do not believe that *Szabo* directs district courts to decide class certification questions based on a preliminary assessment of the ultimate merits of the plaintiffs' claims: to base class certification on a prediction of who will win the case would be at odds with *Eisen*. In our view, the "preliminary inquiry into the merits" discussed in *Szabo* is a more limited one, that has as its focus not the substantive strength or weakness of the plaintiffs' claims but rather whether the path that will need to be taken to decide the merits renders the case suitable for class treatment. It is in this limited sense that the Court assesses the "merits" of plaintiffs' allegations in considering the class certification motion.

### III.

"There are two implied prerequisites to class certification that must be satisfied prior to addressing the issues raised by Rule 23(a). *First*, the class must be sufficiently defined so that the class is identifiable." *Guillory v. American Tobacco Co.*, No. 97 C 8641, 2001 WL 290603, at * 2 (N.D. Ill. March 20, 2001) (emphasis added) (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)). *Second*, "the named representatives must fall within the proposed class." *Id.* With respect to the first point, class definition, the law requires that "[a] class must be clearly defined so that a Court can determine whether a particular individual is a member of the

proposed class." *Id.* (citing *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D. Ill. 1999)). "However, the description must not be so broad as to include individuals who are without standing to maintain the action on their own behalf." *Id.* (citing *Clay,* 188 F.R.D. at 490). With respect to the second point, "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974)) (internal quotations omitted).

The classes proposed by the named plaintiffs fail to satisfy either of these prerequisites. Plaintiffs ask the Court to certify the following two classes:

> A. All African-Americans that were or are employees of International Paper, Chicago area facility, on or after 1999 to the present; and,

> B. All African-Americans that were or are members of [PACE], Local 1216 on or after 1999 to the present.

(Pls.' Mem. at 1). These proposed definitions have the virtue of simplicity; but in their simplicity, they suffer from the sins of extraordinary overbreadth and indefiniteness.

*First,* the time period set forth in the proposed class definitions are overbroad, both on the front end and the back end. The named plaintiffs do not assert that they were subjected to any of the alleged discriminatory conduct when they were employed at the Northlake facility, but only after they transferred to the Chicago facility on or about May 22, 2000. Yet, the proposed class definition seeks to encompass a period that precedes that transfer by nearly one and one-half years. Moreover, all of the named plaintiffs were discharged or laid off from the Chicago facility by no later than November 30, 2001. Yet, the time period urged by the named plaintiffs for the proposed class would

extend some 21 months (and counting) after that date. The named plaintiffs clearly cannot have standing to maintain an action for a time period that preceded their tenure at the Chicago facility, or for a time period that post-dated it.[1]

*Second*, the proposed classes are untethered to any of the alleged misconduct by the defendants that forms the basis of this lawsuit. The proposed classes would include every African-American employee of International Paper's Chicago facility or member of the Local 1216, during a certain time period, without reference to the conduct of the defendants that plaintiffs say violated their rights, and without reference to whether the proposed class members experienced that conduct. The Seventh Circuit has stated that the scope of a class may be defined by reference to the defendants' alleged misconduct. *Alliance to End Repression*, 565 F.2d at 978. Here, that kind of point of reference is particularly important, since the plaintiffs allege varying types of discriminatory conduct that – if proved – would not invariably extend to every named plaintiff or to every African-American employee of the Chicago facility. Although we will discuss this point further in addressing numerosity (*see* pp. 11-29, *infra*), we cite here a few examples to demonstrate the defect in the proposed class definition. While plaintiffs claim discriminatory denial of promotions, some of the named plaintiffs never sought promotions, while others sought and obtained them. Similarly, while eight of the ten named plaintiffs were laid off on November 30, 2001, the evidence indicates that there were African-American employees who were not laid off as of that date (*see* Pls.' Mem., Ex. EEO-1 Reports (March 1, 2002 report showing 13 African-American hourly employees at the

---

[1] We note that Erron Humphrey, one of the named plaintiffs, was recalled to work at the Chicago facility on August 18, 2002 (Defs.' Joint Mem., App. A., Egeland Aff. ¶ 4), and apparently remains employed there. However, the amended complaint, which was filed two months after Mr. Humphrey's return to the Chicago facility, does not allege any discriminatory conduct by either defendant that has occurred during Mr. Humphrey's present tour of duty at the Chicago facility. Thus, we see nothing in Mr. Humphrey's return to the Chicago facility that provides a springboard for extending the time period for the proposed classes.

Chicago facility as of that date)), some whom the plaintiffs suggest are still working at the Chicago facility even now (Pls.' Reply Mem. at 6-7).

*Third*, this failure to provide a reference to the conduct of the defendants that violated the rights of proposed class members is particularly acute with respect to the proposed class definition for the claims against the union. That is because plaintiffs have offered scant evidence that they ever made grievances that they asked the union to pursue. While the plaintiffs say that that is not relevant at this stage (Pls.' Reply Mem. at 5), that assertion is unconvincing in light of the Seventh Circuit's opinion in *Equal Employment Opportunity Comm'n. v. Pipefitters Ass'n. Local Union 597*, 334 F.3d 656 (7th Cir. 2003). In that opinion, the Court rejected an argument that "unions have an affirmative duty to prevent racial harassment or other forms of unlawful discrimination in the workplace." 334 F.3d at 661. The Seventh Circuit explained that a union that refused to grieve a complaint of a black worker when it would grieve the same complaint of a white worker clearly violates Title VII, but that it is a "tenuous theory of discrimination" to assert Title VII liability "where there are no complaints but the union is proactive (*i.e.*, takes the initiative) when it comes to safety and other matters, perhaps even to some forms of discrimination, while adopting a passive stance in regard to racial harassment." *Id.* at 662.

The *Pipefitters* case raises questions concerning the ultimate viability of the plaintiffs' union liability: (1) that the plaintiffs advance is that the president and vice president of Local 1216 could have drafted their own grievances, even if no one asked them to do so, if they saw or heard any racially offensive harassment or discrimination, yet they did not (Pls.' Mem. at 15-16), and (2) that because union stewards "have the discretion to determine which grievances should be written," the grievance procedure *could* have been used to "blatantly discriminate [] against African-Americans"

9

(Pls.' Mem. at 15, 16) (emphasis added).[2] Under *Eisen*, 417 U.S. at 177, of course, a court is not at liberty to deny class certification based on doubts regarding the ultimate merit of a claim. However, the Seventh Circuit's analysis in *Pipefitters Association* underscores the importance of calling out, with some specificity, the union conduct that allegedly violated the rights of the members of the proposed class.

In response to these obvious problems with the proposed classes, the named plaintiffs invite the Court to use its discretion to modify the definitions of the proposed classes (Pls.' Reply Mem. at 3-4). Certainly, "[c]ourts retain broad power to modify the definition of a proposed class." *Buycks-Roberson v. Citibank Federal Savings Bank*, 162 F.R.D. 322, 328 (N.D. Ill. 1995). The Court may use this power "at any time before a final judgment on the merits, if the evidence or the legal principles governing this case establish [] that the class definition is too broad," *id.* at 329, or is inadequate for some other reason. *Metropolitan Area Housing Alliance v. United States Dep't of Housing & Urban Dev.*, 69 F.R.D. 633, 637-38 (N.D. Ill. 1976) (citation omitted). However, we think that this discretion is best exercised after a proposed class has been certified, when subsequent evidence, legal developments or events show that the class then should be tailored in some respect. We have great reluctance to do major surgery on proposed class definitions that are so far from the mark as those offered by the plaintiffs here. Since it is the burden of the plaintiffs to establish all of

---

[2] The plaintiffs also cite to deposition testimony by the named plaintiffs who heard the President of the Union make racist remarks, (Pls.' Mem. at 9-10) and have seen the Vice President of the Union wear the confederate flag (Pls.' Mem. at 10-11). However, as plaintiffs concede (Pls.' Mem. at 2), the officers of Local 1216 are hourly employees of International Paper who have been elected by the union membership at large. Plaintiffs point to no evidence that the alleged conduct of the union president and vice president was taken in their capacities as officers of the union, rather than as employees of International Paper. As the Seventh Circuit made clear in *Pipefitters Association*, the capacity in which these individuals functioned may make a difference as to any union liability. 343 F.3d at 660, 663. Here, the plaintiffs have offered no evidence linking the comments and conduct attributed by these individuals to Local 1216 (as opposed to International Paper), or how they would invite the Court to make the necessary links or inferences that would be necessary to attribute their comments and conduct to Local 1216.

the requirements for class certification, including these required prerequisites of Rule 23(a), the serious inadequacy of the proposed class definition is reason enough to deny the motion. Moreover, as w e explain below, even if modified to address the foregoing problems, the proposed classes still would fail the test of certification.

## IV.

We now turn to the four elements expressly required for certification under Rule 23(a). We assess those elements in light of the rule that a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," and that "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003) (quoting *General Telephone Co. of the Southwest*, 457 U.S. at 160-61.

### A. Numerosity.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). While there is no "bright line" test for numerosity, courts have found this element satisfied where the putative class would number in the range of as few as 10 to 40, at least where joinder of individual putative plaintiffs would be impractical. *See, e.g., Swanson v. American Consumer Indus.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969) (40 sufficient); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (29 sufficient). *See also Barner v. Harvey*, No. 95 C 3316, 1997 WL 139468 (N.D. Ill., March 25, 1997) (class of 13 certified where other factors made joinder impracticable); *Hamid v. Blatt*, No. 00 C 4511, 2001 WL 1543516, at *3 (N.D. Ill. Nov. 30, 2001) (courts have certified class sizes between 10 and 40); *Gaspar v. Linvatec*

*Corp.,* 167 F.R.D. 51, 56-57 (N.D. Ill. 1996) (class of 18 certified); *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* No. 00 C 5755, 2000 WL 1774091, * 3 (N.D. Ill. Dec. 1, 2000) (court must find joinder impracticable where class size is greater than 40); *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.,* 53 F.R.D. 531 (D.N.H. 1971) (class of 13 certified where factors making joinder impracticable present). *But see Miller v. Motorola,* 76 F.R.D. 516 (N.D. Ill. 1977) (certification refused to class of 20 where joinder was practicable); *Sample v. Aldi,* No. 93 C 3094, 1994 WL 48780, at * 9 (N.D. Ill. Feb. 15, 1994) (court refused to certify a class of 9 individuals); *Massie v. Ill. Dept. of Transp.,* No. 96 C 4830, 1998 WL 312021, at * 2(N.D. Ill., June 5, 1998) (joinder considered impracticable where class consists of 53 members); *Toney v. Rosewood Care Center,* No. 98 C 0693, 1999 WL 199249, at * 6 (N.D. Ill. March 31, 1999)(40 members generally necessary to certify class).

In making the numerosity determination, "the court is entitled to make common sense assumptions." *Keele v. Wexler,* No. 95 C 3483, 1996 WL 124452, at * 3 (N.D. Ill., March 19, 1996), *aff'd,* 149 F.3d 589 (7th Cir. 1998); *see also Patrykus v. Gomilla,* 121 F.R.D. 357, 360 (N.D. Ill. 1988). Thus, while "the one who asserts the class must show some evidence or reasonable estimate of the number of class members," if a plaintiff cannot provide precise numbers," a good faith estimate is sufficient [to satisfy the numerosity requirement] where it is difficult to assess the exact class membership." *Long v. Thornton Township High Sch. Dist. 205,* 82 F.R.D. 186, 189 (N.D. Ill. 1979).

However, courts should not confuse a "good faith estimate" with pure speculation. A plaintiff cannot simply assert a number that falls between 10 and 40 without showing that there has been an attempt to ascertain the approximate class size by supplying factual assertions, supported

by evidence, that would justify the Court's conclusion that a sufficient number of potential class members exists and that such numbers would make joinder impracticable. *See, e.g., Waller v. Int'l Harvester Co.,* 98 F.R.D. 560, 563 (N.D. Ill. 1983). The bottom line is that the case law does not support a finding of numerosity if the evidence only points to a class size sufficiently modest that joinder would not be impracticable. *Sample,* 1994 WL 48780, at *6.

In this case, there are multiple problems with the plaintiffs' proof on the numerosity element of Rule 23(a). At the outset, the Court notes that the named plaintiffs do not argue that there is a future class at issue. They argue that numerosity is based on those African-American employees who were present at the Chicago facility at the same time that they were employed (from May 22, 2000 through November 30, 2001). Initially, plaintiffs asserted a class size of 178 people, based on EEO-1 reports for the one-year reporting periods ending March 1, 1999, February 28 2001 and March 1, 2002 (Pls.'Exs., EEO-1 Reports).[3] Of course, we cannot simply accept this number on faith. We need some evidence and some roadmap as to how to reach this number. The plaintiffs have offered neither: they do not explain how the 178 figure is derived from the EEO-1 reports.

And, our independent review persuades us that the 178 number finds absolutely no support in the EEO 1 reports. Those reports show that there were never more than 145 employees – of all races – at the Chicago facility in any of those years. The EEO-1 reports further show that the total number of African-American employees (both hourly and salaried) in the 1999, 2001, and 2002

---

[3]Neither the plaintiffs nor the defendants offer the EEO-1 report for the period ending on or about March 1, 2000, the date shortly preceding the transfers from the Northlake to the Chicago facility. Nor do the parties explain why that particular report has not been submitted.

reporting periods were 12, 30, and 16 respectively.[4] Nor do the EEO-1 reports show that the Chicago facility had the kind of employee turnover that could support an inference that substantially greater numbers of African-Americans passed through the Chicago facility during those time periods. We therefore reject plaintiffs' assertion of 178 putative class members as unfounded.

Not surprisingly, plaintiffs retreat from that figure in their reply, and assert a far more limited number of putative class members: 30 (Pls.' Reply Mem. at 7). The plaintiffs reach the number 30 by the following process. The plaintiffs assert that all 10 of the named plaintiffs have standing to assert all four claims for relief: racial harassment; race discrimination; racially discriminatory layoffs; and retaliation. Plaintiffs then assert that the number climbs from 10 to 23, based on names taken from a report prepared on or around April 26, 2001 by Kathleen Edmonds, hired by International Paper to conduct a fact gathering investigation regarding the allegations of discrimination (Pls.' Dep. Exs. 54, 56) (the "Edmonds Report") (Pls.' Reply Mem. at 6, n.5). The plaintiffs next assert that the EEO-1 reports, which they initially asserted showed that there are 178 potential class members, reveals that "there seems to be an additional seven potential class members" – bringing the total class size to 30, which they assert is "a sufficient number to meet the numerosity requirement" (Pls.' Reply Mem. at 7, n.6).

We are not terribly sanguine about plaintiffs' methodology in reaching the number of 30 putative class members, which is not faithful either to the documents cited or even to simple arithmetic accuracy. The Edmonds Report discloses 12, not 13 names, which plaintiffs list in their

---

[4] We are able to derive this number using the information in the Egeland Affidavit, which explains that the code letters "C" and "H" in the EEO-1 reports refers to male and female African American employees, respectively (Defs.'Joint Mem., Egeland Aff., at ¶ 3). Inexplicably, neither side provided that information in the text of their memoranda or even referred the Court to the Egeland affidavit, leaving the Court, instead, to find this information in its independent review of the exhibits.

brief (Pls.' Reply Mem. at 6, n.5) but then incorrectly tabulate. Moreover, in reviewing Edmonds Report (Pls.' Dep. Exs. 54 and 56), we can find no reference to Sam King or Donnell Embry, two of the people that plaintiffs include in the tabulation. Likewise, one of the seven individuals whom plaintiffs claim are disclosed by the EEO-1 Reports (Pls.' Reply at 7, n.6) in fact is not in those reports: Verona Mitchell. Thus, even assuming the validity of plaintiffs' suggestion that all of the people that they identify from the Edmonds Report and the EEO-1 Reports should be included as putative class members – which, for the reasons we explain below, we do not accept – the total number of putative class members that would result from plaintiffs' analysis would be 26, and not 30.

For their part, the defendants have done little to assist the Court in determining the number of African-Americans were employed by the Chicago facility between June 10, 2000 and November 30, 2001. One would think it a simple matter for International Paper to consult its employment records (which, as we know from the EEO-1 reports, do track the race of employees) to prepare a list, by name, of all African-American employees who worked at the Chicago facility during that time period, and their dates of employment. That was not done. Instead, the defendants include in the exhibits to their brief an affidavit from Kate Egeland, a Human Resources Generalist at the Chicago facility, which states that as of February 28, 2001 (the end of a one-year reporting cycle beginning March 1, 2000), 30 African-Americans were employed at the Chicago facility (Defs.' App., Ex. A, ¶ 3), relying on one page of the EEO-1 Reports included in plaintiffs' exhibits. The defendants do not offer any guidance as to the identity of those 30 African-American employees, or when they were hired.

Nor do the defendants disclose whether there were additional African-American employees who worked at the Chicago facility between June 10, 2000 and February 28, 2001, but no longer were there at the end of the reporting period; or whether additional African-American employees were hired between March 1 and November 30, 2001. The applicant flow log (which shows applicants and hirees for the same one-year period covered by the annual EEO-1 report) shows that between March 1, 2001 and February 28, 2002, the Chicago facility did not hire any African-American employees. The log for the period for March 1, 2000 to February 28, 2001 shows that the Chicago facility hired 16 African-American employees, and had 30 in all at the end of that reporting period. We know that two of those employees – Devin Baxter and Percy Jones – were both hired and terminated during that one-year period. That would suggest that if there were 30 African-American employees at the Chicago facility as of February 28, 2001, there were at least 32 during that one-year period who were employed there at some point in time. But, we also have some question about the integrity of the numbers in the applicant log, since it does not show as hirees during the one-year period two of the named plaintiffs – Erron Humphrey and William Robinson – who plainly were hired during that one-year period.

We point out that these gaps and questions presented by the evidentiary record have been revealed by the Court's independent analysis of the documents, which the Court was forced to conduct without the benefit of guidance from the parties. There is no excuse for the failure of either side to provide the evidence, and an explanation of it, that would provide the basic framework for a numerosity analysis. "Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 955 (7th Cir. 1991). Because it is the plaintiffs' burden to establish

numerosity, the burden of that failing falls more heavily on the plaintiffs.[5] In the face of these gaps and unanswered questions, we are inclined to look at the total number of African-Americans employed at the Chicago facility during the relevant period as roughly 30: which is both the total suggested by plaintiffs in their reply and is the largest number established in the summary annual EEO-1 Report. While that number may not precisely state the number of African-American employees at the Chicago facility during the relevant time period, from the evidence submitted we believe it is a close approximation of that total. Accordingly, we believe that it is a fair starting point to use for the numerosity analysis.

We emphasize that it is a starting point only and not the end. That is because we do not assume, as the plaintiffs ask the Court to do, that every African-American employee necessarily is a putative class member with respect to every form of harassment or discrimination that is alleged in the complaint. Rather, as we described above, it is necessary to examine each of the overarching claims of discrimination asserted by the plaintiffs, and to determine whether all African-Americans employed at the Chicago facility during the time period may have been subjected to that alleged discrimination. We embark upon that analysis below.

---

[5] In its memorandum in support of class certification, filed on March 13, 2003, plaintiffs complained that International Paper had failed to turn over certain documents relevant to class certification issues despite an order entered by the Court on February 13, 2003 requiring International Paper to do so (Pls.' Mem. at 1, n.2). Plaintiffs therefore reserved their right to supplement their memorandum with any subsequently produced documents. In the nearly six months that has intervened since the filing of the motion, all non-expert fact discovery has been completed. The plaintiffs have never filed a motion in connection with the documents that it claims were improperly withheld, and the plaintiffs have never sought to supplement their motion with additional factual material. The plaintiffs have had ample opportunity to take discovery relating to numerosity, as well all other class issues, and to bring any relevant materials to the Court's attention. Any failure of proof properly rests with the plaintiffs.

## 1. Racial Harassment Claim.

In Count I, plaintiffs seek to certify a class based on allegations that Caucasian employees and supervisors at the Chicago facility engaged in a pattern and practice of racial harassment against African American employees, creating a hostile work environment in violation of Title VII. The plaintiffs base this hostile work environment/harassment claim on allegations that officers and employees at the Chicago facility engaged generally in "offensive and demeaning language; graffiti, property damage, racial slurs and derogatory names" (Pls.' Mem. at 7). In particular, the plaintiffs have alleged and testified to use of the word "nigger" as well as racial jokes related to such a name; other demeaning language; the wearing and depiction of the confederate flag; racially loaded and derogatory graffiti; racially segregated lunch tables and eating areas; and the sabotage of personal property, as well as work areas (Pls.' Mem. at 8-14) (citing depositions).

We do not accept the proposition (implicit in plaintiffs' class certification motion as originally cast) that every African-American employee was subjected to this alleged hostile work environment, simply because the employee was African-American. We start with the ten named plaintiffs, who all claim they were subject to a hostile work environment, and from there look for evidence that other African-American employees might fall within a class that was subjected to that environment – which is the approach to which the plaintiffs retreated in their reply memorandum.[6]

The plaintiffs claim that the Edmonds Report shows that 13 African-American employees – in addition to the plaintiffs – were subjected to a hostile work environment. As we explained

_____

[6]For purposes of this analysis, we accept that all ten named plaintiffs could fall within a class of African-American employees subjected to a hostile work environment. However, we note that two of the named plaintiffs were terminated shortly after they began work at the Chicago facility: Devin Baxter was terminated on May 29, 2000 (only one week after he started), and Percy Jones was terminated in July 2000, about two months after he started. Moreover, neither of those individuals filed timely EEOC charges alleging a hostile work environment. Thus, as we explain below, in no event could these two individuals be class representatives on such a claim.

18

above, the number of names culled by the plaintiffs from the Edmonds Report totals 12, not 13; and that number must be further reduced because two of the names cited by the plaintiffs do not appear in the report. Thus, there are only 10 names listed by the plaintiffs that appear in the Edmonds Report: Anthony Dickerson, John Arrends, Hubert Nelson, Jon Funches, Charles Mitchell, Carvis Nelson, Eric Hayes, Robert Moore and Demetrius Farr. However, we cannot simply include all of these individuals in a group that was subjected to the alleged hostile work environment, without examining how their names arise in the Edmonds Report and what other information is provided in that report. To begin with, the Edmonds Report noted that an anonymous complaint that triggered the investigation stated that the harassment was focused on former Northlake employees who had transferred to Chicago – which would be at most approximately 15 (Pls.' Exs., P. Dep. Ex. 56 at 4). Moreover, the report noted that while employees on all three shifts at the Chicago facility were interviewed, they reported that alleged harassment was "almost exclusively a third-shift problem" (*Id.*, at 4). The parties do not disclose which African-American employees worked on which shifts. However, given that the employees who transferred from the Northlake Facility all had hire dates of May 22, 2000 for purposes of competitive bidding, they likely would be among the most junior employees and thus most likely to be able to hold jobs only on the third shift (which often is considered less desirable than the other shifts). In any event, this evidence from the Edmonds Report does not support the proposition that all African-American employees, on whatever shift they worked, should be included within a class asserting a hostile work environment.

Nor does the Edmonds Report support the proposition that every person interviewed in the report was subjected to that environment. Two of the individuals interviewed by Ms. Edmonds – Donnell Embry and Demetrius Farr – were identified in the report as providing only hearsay

knowledge of third-shift intimidation. This evidence gives the Court no comfort that those two individuals themselves were subjected to the alleged hostile work environment. As a further measure of the insufficiency of plaintiffs' proof, we note that plaintiff has not even offered evidence that all of the people whom plaintiffs seek to add to a plaintiff class based on the Edmonds Report are, in fact, African-American. We make this observation because one cannot assume that simply because someone was interviewed by Ms. Edmonds that individual was African-American. In fact, there appears to be no dispute that at least two of the individuals interviewed as part of the Edmonds Report are Caucasian: Messrs. Jakonis (Pls.' Mem. at 14), and Baker (Defs.' Ex., Egeland Dep. at 73). Moreover, there is evidence that is assembled in the exhibits (but not pointed to by the parties) that establishes that five of the eight individuals not excluded by the Court's foregoing analysis are African-American (Messrs. Funches (P. Ex. 65, EEOC Charge); Moore and Carvis Nelson (EEO-1 Report for the period 03/00-02/01); Mitchell (Pls.' Exs., Vol. I, Thomas at 145, 353); and Dickerson (Pls.' App., Egeland Tr., Pl. Ex. 27 (layoff report)). That leaves three others – Messrs. Arrends, Hubert Nelson and Hayes – for whom no evidence is presented that they are African-American. Initially, we were willing to make the assumption that the plaintiffs have correctly identified the race of these individuals, particularly given that the defendants did not suggest otherwise. But, regrettably, it appears that the Court cannot even place this level of confidence in the plaintiffs' reading of the documents, since the EEO-1 Reports that plaintiffs themselves have submitted show that one person Eric Hayes – who plaintiffs propose to add to the class – is white (Pls.' Exs., EEO-1 Reports, Applicant Flow Log for plan year 03/01/98 through 02/28/99, at 17). We cannot even find Messrs. Arrends and Hubert Nelson in the EEO-1 Reports provided – meaning, perhaps, that they were hired prior to March 1, 1998 (the earliest date of the reports provided), or between March 1,

1999 and February 28, 2000 (a period for which we have been given no reports); or that they were never employed during an appropriate class time period. Even assuming that those individuals are African-American, we were unpersuaded that the Edmonds Report warrants adding any more than seven individuals to a proposed hostile work environment class.

We now turn to plaintiffs' suggestion that seven more individuals should be added to the putative class on the hostile workplace claim based on the EEO-1 Reports (Pls.' Reply Mem. at 7, n.6). Plaintiffs do not direct the Court to where these names may be found in the 49 pages of documents (that are not Bates numbered) comprising the EEO-1 Reports. However, our page-by-page review of the EEO-1 Reports reveal that these numbers, too, are unreliable.

Four of the names identified by the plaintiffs – Eddie Brooks, Will Brown, Vernon Nelson and Michael Wilson – are, in fact, disclosed in those reports as being employed during the potential class period. The EEO-1 Reports show that two other African-American individuals were hired in 1998: James Tate and Anthony House (Pls.' Exs., EEO-1 Reports, 1998-1999 Application Log, at 18). However, just a few pages later in those same reports, the records show that both Messrs. Tate and House voluntarily left the employment of the Chicago facility in 1998 (*see id.*, Termination Log), and thus never were employed at the Chicago facility during even the overly broad class period urged by the plaintiffs. Finally, one name identified by the plaintiffs, Venora Mitchell, does not appear in the EEO-1 Reports at all, and we have no evidence that she was employed at the Chicago facility at any time – whether during the class period or at some other time.

Thus, at most, the EEO-1 Reports might add four potential class members to the hostile workplace class plaintiffs seek. However, none of these individuals appear in the Edmonds Report; there is no evidence that they were subjected to the alleged hostile work environment; and plaintiffs

offer no explanation as to why their presence in the EEO-1 Reports would make them potential class members, other than simply because they are African-American – which, for the reasons we explained, is not a sufficient basis, standing alone, for including them in a potential class without some indication that they may have been exposed to the alleged hostile work environment.

In any event, even accepting plaintiffs' methodology for expanding the putative class members beyond the 10 named plaintiffs, at most we would arrive at a number of 21 (by adding to the 10 named plaintiffs the seven people cited from the Edmonds Report who are African-American and who are not merely listed as "hearsay" witnesses, and four African-Americans from the EEO-1 Reports who are not named plaintiffs and who were employed during the potential class). A putative class of that size does not, in the Court's view, satisfy the numerosity requirement, unless it is also the case that joinder would be impracticable. As we explain below (see pp. 26-29, *infra*), it is not.

## 2. Racial Discrimination.

Count II alleges a pattern and practice of race discrimination in hiring, promotions, compensation, work assignments and discipline. Thus, this alleged racial discrimination claim incorporates several types of conduct. The fact that each specific type of conduct was not personally experienced by all of the named plaintiffs does not itself pose an inherent numerosity problem; only one named plaintiff needs to have standing to be an adequate representative for a potential class vis-a-vis the alleged conduct. *See Hispanics United of DuPage County v. Village of Addison,* 160 F.R.D. 681, 690 (N.D. Ill. 1995). The Seventh Circuit has also held that numerosity cannot be satisfied by alleged facts that relate solely to the named plaintiffs' personal grievances. *Patterson v. General Motors Corp.,* 631 F.2d 476, 480 (7th Cir. 1980). Rather, the evidence must indicate that other employees have been discriminated against in the same manner, or that there is a likelihood of a

future class being discriminated against. *Id.* The problem is that there is no evidence that there are any potential class members beyond the plaintiffs who experienced or witnessed the allegedly offending conduct. This will become more clear as we break down the allegations.

With respect to promotions, two of the plaintiffs (Messrs. Bobo and Robinson) testified that they bid for several promotions at the Chicago facility and *received* them (Bobo Tr. 43-46; Robinson Tr. 48-49), while two plaintiffs (Messrs. Baxter and Myles) never applied for any promotions at all (Baxter Tr. 50-51; Myles Tr. 62). There is only one plaintiff, William Robinson, who testified that he inquired about a promotion for a supervisor position (in the "Flexo Department") and had an "informal interview" but was not selected for the position even though a Caucasian employee received it (Robinson Tr. 130-32). Another plaintiff, Tyrone Thomas, testified that he witnessed racial discrimination with respect to promotions and said that Donnell Embry, an African-American employee at the Chicago facility, was denied a promotion that a Caucasian employee received (Thomas Tr. at 353). Mr. Thomas also testified that promotion opportunities were not posted on the employee information board (*Id.* at 229). The plaintiffs offer no other evidence of racial discrimination related to promotions; nor do they point to any number of other employees who might have suffered from such conduct. This evidence seriously undermines numerosity on any promotion claim.

With respect to disciplinary write-ups, two plaintiffs (Messrs. Bobo and Myles) stated that they never received any written reprimands, and another (Mr. Thomas) stated that he had experienced no loss of pay or benefits as a result of two minor disciplinary incidents (Bobo Tr. 97; Thomas Tr. 163; Myles Tr. 61). The Edmonds Report does not list disciplinary write-ups as a complaint, so there are no names listed for this allegation. The plaintiffs, who carry the burden of

proof on certification, do not offer any other evidence of names. Thus, we find that there would be no class representative for this alleged conduct.

There are similar problems with plaintiffs' attempt to establish numerosity with respect to their claims of discrimination in transfers, work assignments and compensation. There is no evidence offered to establish how broadly this alleged discrimination swept, or who was subjected to it. Like the hostile workplace claim, there is no evidence the plaintiff offered to suggest that the bulk of the alleged discriminatory conduct occurred anywhere but on the third shift, thereby limiting the scope of people who would be subjected to it.

There is one argument about transfers between jobs that sweeps more broadly. The plaintiffs argue that International Paper's decision to allow the transferees from Northlake to use the accrued company's seniority only for non-competitive purposes, and not for job bidding. Plaintiff claims that this resulted in African-American employees being bumped from jobs and losing compensation (Pls.' Mem. at 18, citing Bobo Tr. at 93). The plaintiffs argue that International Paper's decision to bar Northlake transferees from using accrued company seniority for competitive purposes was in contrast to International Paper's practice when it acquired facilities that did not have a predominately African-American workforce (Pls.' Mem. at 18). For their part, the defendants claim that their handling of seniority with respect to the transferred Northlake employees was typical of International Paper's "practice of handling the seniority of terminated employees who were later re-hired at other facilities" (Defs.' Joint Mem. at 5, citing Egeland Aff., Appendix A, at ¶ 2). Whatever the fact concerning whether International Paper's handling of seniority for the Northlake transferees was typical of its prior practices, it is undisputed that the handling of seniority was reflected in an agreement reached between International Paper and PACE Local 1216 dated May 11, 2000. That,

24

then, is the trigger date for the time to begin running on the statute of limitations for the plaintiffs to assert that the handling of seniority was discriminatory. *Franks v. Bowman*, 424 U.S. 747, 756 (1976). There was no timely EEOC charge filed within 300 days of that event (the earliest charge was not filed until 15 months later), and no complaint was filed within the two year Statute of Limitations for Section 1981 claims (the complaint here was filed in June 2002). Thus, we fail to see how any named plaintiff would have standing to represent a class on such a claim.

The other acts of discrimination alleged that fall within Count II include: cursing and name calling; racially charged comments; racial jokes; racially derogatory graffiti, physical abuse (objects being thrown at African-Americans); harsh treatment (including damage to African-American machines and property); lunch table segregation; and the display and wearing of the confederate flag. Some of this conduct could also fall into the category of racial harassment. So, the Court has counted the names of those alleging both kinds of conduct. But, at most, this would lead to a class of no more than 21 people on the discrimination claim. Again, we believe that there are an insufficient number of potential class members to certify a class, even if all the claims are grouped together under one theory, and we address that issue in our discussion of joinder below.

### 3. Discriminatory Layoffs.

Count III alleges discriminatory layoffs. The defendants (not the plaintiffs) offer a document attached to the Egeland deposition transcript that lists 18 names of employees laid off by the Chicago facility on November 30, 2001 (Defs.' App., Egeland Tr., Pls.' Ex. 27). That document indicates that of the 18 people laid off, eight were the named plaintiffs and five others were African-Americans. That means that there are only 13 potential class members, including plaintiffs, for the

lay off class. The question here is therefore whether certification for such a small class is warranted. We believe not, based on joinder issues that we reach below.

### 4. Retaliation.

Finally, in Count IV, the plaintiffs allege class-wide retaliation, based on their layoffs, their complaints of racial discrimination, the alleged statement of the union president that International Paper would not re-hire anyone who brought a lawsuit after racial complaints were made (Am. Compl. ¶¶ 169-83). But, only three plaintiffs filed retaliation charges with the EEOC (Messrs. Humphrey, Thomas and Theodis Jones). The others did not include a retaliation claim in the EEOC charges filed several months after their discharges or layoffs, and cannot claim that those charges include retaliation. *See, e.g., Fundukian v. United Blood Services*, 18 Fed. Appx. 572, 574 (9th Cir. 2001) (employee did not raise claims of Title VII discrimination by checking box on form indicating that retaliation as the basis for her claim). Therefore, only these three plaintiffs could act as class representatives for a Title VII retaliation claim. But apart from that point, the question remains whether there is any evidence that other putative class members were subject to the retaliation alleged by these plaintiffs. The law does not automatically give class members who have not filed retaliation charges with the EEOC a pass on the requirement of a timely charge by use of the single-filing rule (discussed below). *See Allen v. City of Chicago,* 828 F. Supp. 543, 555 (N.D. Ill. 1993). Those non-filing members would first need to establish that their claims arose "out of sufficiently similar discriminatory treatment." *Id.* No such showing has been made here. Moreover, the plaintiffs have not pointed the Court to evidence that others of the potential 21 class members have been subjected to any alleged retaliation.

## 5. Practicability of Joinder.

Based on plaintiffs' proof, adding all potential African-American class members together for all claims (without double counting) only results in a maximum class size of 21: 10 named plaintiffs plus seven African-Americans from the Edmonds Report, plus four additional people from the layoff document. We might then add Lorenzo Cook, who plaintiffs assert (in a footnote) filed a charge with the EEOC (Pls.' Reply at 6, n.5). Adding Mr. Cook would create at most a class of 22 on the most encompassing claims of hostile work place – and fewer on the other claims. Under the case law in this district, those numbers result in a class size that is too small to certify unless joinder is impracticable. We find that it is not in this case, because none of the factors that other courts have relied on to certify small classes where joinder was found impracticable is present.

For instance, in *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* No. 00 C 5755, 2000 WL 1774091 (N.D. Ill. Dec. 1, 2000), the Court wrote that "[w]here the class size is relatively small, courts do consider other factors such as judicial economy by avoiding a multiplicity of actions, the size of individual claims, the financial resources of class members, the ability of the claimants to bring individual lawsuits and geographic disbursement." *Id.* at * 4 (citing 1 NEWBERG ON CLASS ACTIONS, § 3.06 (3d ed. 1992); *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 56 (N.D. Ill. 1996) (citing cases where classes as small as 13 to 20 were certified)). In this case, we have no proof that the putative class members (who are few in number) are of such limited means that pursuing individual claims would be difficult for them. On this score, we note that while plaintiffs' counsel asserts that "[s]ome of the named [p]laintiffs are currently unemployed, others are employed at lower paying jobs then when they were employed at [International Paper], and most [p]laintiffs testified that they had [a] limited amount of resources" (Pls.' Reply Mem. at 6), they do not say that this is

27

the case with respect to the unnamed putative class members. And, indeed, many of those people were not laid off in November 2001 from International Paper, and there is no indication that they lack the resources to have filed suit if they so desired. Given that the name plaintiffs indicate that they have limited resources and nonetheless were able to find an attorney to bring this lawsuit (presumably on a contingency fee basis), we see no reason that the unnamed putative class members could not have done so as well.

There is also no indication that the unnamed class members are widely dispersed geographically. Indeed, given that a number of the unnamed putative class members were not laid off in November 2001, and there is no evidence that they have subsequently left employment at International Paper, we see no reason to presume that these individuals are not in the Chicago area. Certainly, plaintiffs have offered no evidence to the contrary.

Plaintiffs argue that joinder would be impractical because "there are potential class members currently working at the facility that would inhibit employees and union members from coming forward" (Pls.' Reply Mem. at 6). However, the plaintiffs have offered no evidence that current employees have been chilled from coming forward due to a fear of retaliation. Indeed, we note that one of the named plaintiffs, Mr. Humphrey, was recalled from lay off at International Paper on August 18, 2002, which was two months after this lawsuit was filed. And, in the amended complaint filed in October 2002, there is no allegation by Mr. Humphrey that he has been retaliated against since his recall. Accordingly, we see no basis to conclude that joinder would be impracticable because unnamed plaintiffs would be unwilling to sue for fear of retaliation.

Finally, we do not believe that there is significant judicial economy that likely would be achieved in this case by certifying a class on any of the particular claims the plaintiffs have alleged

28

against International Paper. With respect to the promotion claim, plaintiffs have offered evidence that, at most, only one person beyond certain of the named plaintiffs was subjected to a denial of promotion. With respect to the layoff claim, five of the 13 African-American individuals who were laid off elected not to file EEOC charges or join this suit; we do not believe that the interest of judicial economy would be served by certifying a class that would bring into the case these individuals who elected not to file a charge or lawsuit in a timely fashion. And, with respect to the other claims of alleged discrimination, we believe that they are so bound up in individual issues of what particular discrimination or hostile environment particular people may have been subjected to, that the need for individual determinations would largely offset any judicial economy that would be achieved by certifying a class.

In cases with as few potential class members as this one, the numerosity requirement will be met only if joinder of all members is "extremely difficult or inconvenient." *See, e.g., Joiner v. E&H Plastics Co.,* No. 92 C 1635, 1993 WL 565994 at * 3 (N.D. Ill., Oct. 1, 1993). We find that joinder would be neither extremely difficult nor inconvenient here. Accordingly, the Court finds that the plaintiffs have failed to establish numerosity as to the any class of plaintiffs in connection with the various types of discriminatory conduct they have alleged in the amended complaint.[7]

### B. Commonality.

Rule 23(a)(2) requires that plaintiffs prove the existence of questions of law or fact that are common to the proposed class. *See, e.g., Buycks-Roberson,* 162 F.R.D. at 329. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement," *Rosario v. Livaditis,* 963

---

[7]This numerosity analysis applies with equal force to the attempt by the plaintiffs to certify a class with respect to the claims against Local 1216.

F.2d 1013, 1018 (7th Cir. 1992) (citation omitted); thus, "some factual variation among the class grievances will not defeat a class action." *Id.* at 1017. Commonality is not a difficult requirement to meet: only one issue of law or fact needs to be common to all class members, and standardized conduct with some variation among class members will do. *Meiresonne v. Marriot Corp.,* 124 F.R.D. 619, 622 (N.D. Ill. 1989); *see also Gomez v. Ill. State Board of Educa.,* 117 F.R.D. 394, 399 ("[t]here need only be a single issue [of law or fact] common to all members of the class, and differences in individual class members' cases concerning damages or treatments will not defeat commonality").

The plaintiffs argue that the commonality requirement has been met because "the essence between all the [p]laintiffs and other African-Americans is the same: that [d]efendants fostered a hostile work environment through their ineffective and unenforced policies; that [d]efendants subjected [p]laintiffs and other African-Americans to various discriminatory terms and conditions of employment; that [d]efendants' discriminatorily laid off [p]laintiffs and other African-Americans; and that [d]efendants retaliated against [p]laintiffs and African-Americans solely due to their race or their opposition to race discrimination and harassment" (Pls.' Reply Mem. at 8). The defendants seek to defeat certification with respect to commonality on the basis that the claims alleged by plaintiffs in the amended complaint are "too individualized and personal" (Defs.' Joint Mem. at 16). In particular, the defendants contend that the alleged racial harassment was experienced by only some and not all of the proposed class representatives (*e.g.,* only a few plaintiffs testified that they heard racial slurs, saw graffiti, or experienced segregation at lunch room tables), and thus the plaintiffs cannot contend that the alleged harassment was "commonplace" (*Id.* at 17-18). In short, defendants contend that the commonality requirement cannot be met in this case because the

plaintiffs do not have any evidence to support a "common discriminatory practice or policy which negatively impacts the *entire* class" (*Id.* at 19).

Although the commonality requirement demands evidence that points to a generally similar course of conduct that is illegal, it goes too far to say that certification must be denied unless the "entire class" experiences or witnesses exactly the same conduct. There need only be one adequate class representative for a single legal claim at issue, *see Hispanics United DuPage County,* 160 F.R.D. at 690; there may be factual variations among claims and class members that create the need for multiple subclasses of plaintiffs who experience some but not all of the alleged conduct. *Buycks-Roberson,* 162 F.R.D. at 329.

Here, the gravamen of plaintiffs' complaint is that African-American employees were subjected to adverse employment actions and conditions on account of their race. In some instances, the specific alleged discriminatory conduct is precisely the same with respect to all African-American employees who allegedly experienced it: such as, the employees who claim that they were laid off because of their race or because they made complaints about discrimination, or that they were denied promotions because of the effects of the company's decision to forbid the transferring employees from the Northlake facility to use company seniority for bidding purposes. As to the claim of racial harassment, plaintiffs allege a variety of conduct that created the alleged hostile workplace: racial slurs and jokes, racially derogatory graffiti, the display and/or wearing of the confederate flag, segregated lunch tables; and damage to property owned by African-American employees. All of this conduct allegedly emanated from an alleged bias against African-American employees, and allegedly was intended to create a hostile workplace. The fact that there may be some variation among the plaintiffs (and there is) with respect to which portions of the alleged

harassing conduct they experienced does not eliminate commonality. Similarly, there is a variety of conduct that the plaintiffs allege constituted discrimination in the terms and conditions of employment: such as, unequal enforcement of work rules, unequal imposition of discipline, and denial of transfers.[8] Once again, the common thread that unifies the claim of discrimination in the terms and conditions of employment is that the alleged actions by the defendant International Paper were motivated by racial animus; the fact that the plaintiffs allege that they experienced this animus in somewhat different ways with respect to terms and conditions of employment does not defeat commonality.[9]

## C. Typicality.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." A claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7ᵗʰ Cir. 1983) (internal quotations omitted). Therefore, the typicality prong "may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of the other class members." *Id.* The key to typicality is based on the relationship between the class representative and the class members: are the named plaintiff's interests aligned with those of the proposed class in

---

[8]For example, the Edmonds Report indicates that, in general, black employees complained that "work rules are enforced differently for black employees than for white employees." Specifically, there were complaints that white employees were allowed to socialize on the job, but black employees were not and would be "verbally warned;"similarly, black employees were allegedly required to wait for a buzzer before going on break, but white employees would leave before the buzzer, which would permit "white employees to leave the building and drive to Burger King or elsewhere to eat, which black employees cannot do . . . ." (Pls.' Dep. Ex. 54).

[9]Likewise, the asserted claim against the union also meets the commonality requirement. The essence of the claim against the union is that it refused to take affirmative measures to route out the discrimination that was allegedly being perpetrated by International Paper. This alleged failure to act plainly was common to all African-American employees (and members of Local 1216) who allegedly experienced discrimination at the hands of International Paper.

such a way that the representative, in pursuing his own claims, will also advance the interests of the class. *Guillory v. American Tobacco Co.,* No. 97 C 8641, 2001 WL 290603, * 3 (N.D. Ill., March 20, 2001) (citing *In re American Med. Sys., Inc.,* 75 F.3d 1069, 1082 (6ᵗʰ Cir. 1996)).

In this case, the defendants contend that the plaintiffs' claim of typicality is defeated because the named plaintiffs' employment experiences varied widely, and the plaintiffs' claims represent individual grievances of purported discrimination that do not raise broader, class-wide implications (Defs.' Mem. at 20). For example, with respect to the layoff claims, eight of the plaintiffs complain about being laid off in November 2001; but, Mr. Humphrey was recalled to work on August 18, 2002 and is still working at the Chicago facility (Defs.' Joint Mem. at 20). The defendants also contend that the plaintiffs' "diverse testimony regarding their allegedly disparate discipline also negates any inference that their claims 'arise from the same event or practice or course of conduct that would give rise to the claims' of other class members" (*Id.* at 21). For example, Messrs. Bobo, Myles and Love admitted that they never received any disciplinary write-ups; Mr. Thomas conceded he experienced no loss of pay or benefits as a result of two minor disciplinary incidents (*Id.* (citing Bobo Tr. 97; Thomas Tr. 163; Love Tr. 104; Myles Tr. 61)). Mr. Baxter could not identify a single Caucasian employee who received preferential treatment with respect to discipline. With respect to disciplinary write-ups, as well as work assignments and promotions, Mr. Myles stated that the allegations of the amended complaint simply did not apply to him (Myles Tr. 62-65).

Plaintiffs, in turn, argue that any factual differences between some class members and others, and any differences with respect to injuries that may have been suffered, are irrelevant to the typicality requirement because this requirement is only concerned with the "nature of the claim of the class representative and not the specific facts from which it arose" (Pls.' Reply Mem. at 9). *See*

33

*Joiner,* 1993 WL 565994, * 4. *See also De La Fuente,* 713 F.2d at 232. We agree that the legal theory plaintiffs advance that joins them together under the typicality element is the alleged pattern and practice of racial discrimination that manifested itself in a hostile work environment. That theory has various sub-parts and specific factual and legal claims, but each of the various claims need not be shared by everyone in the entire class; assuming numerosity, subclasses could be formed to deal with the factual and legal variations inherent in those claims. We do not believe, as defendants claim (Defs.' Joint Mem. at 23-24), that there is not at least one named plaintiff who could establish that his interests are aligned with the proposed class and/or subclasses. As with commonality, the plaintiffs' general theory of a racially hostile work place ties all the claims of plaintiffs and potential class members together to satisfy the typicality requirement.[10]

### D. Adequacy of Representation.

To be an adequate representative of a class, a plaintiff must have a sufficient stake in the outcome to ensure zealous advocacy and must not have antagonistic or conflicting claims with other class members; moreover, counsel for the named plaintiff must be experienced, qualified, and generally able to conduct the litigation. *Retired Chicago Police Ass'n,* 7 F.3d at 598. The class representative must also have the same interest as the other class members in establishing the claims alleged against the defendant in the case. *Hoffman v. Grossinger Motor Corp.,* No. 96 C 5362, 1999 WL 184179, at * 5 (N.D. Ill. March 29, 1999). In this case, the defendants make three arguments challenging adequacy.

*First,* the defendants argue that plaintiffs have competing interests among themselves. The defendants point to the fact that, although eight of the named plaintiffs (all from Northlake) were laid

---

[10]Again, this reasoning applies equally to plaintiffs' class claims against Local 1216.

34

off, some of the original 15 African-American employees from Northlake are still employed at IP-Chicago (were not laid off on November 30, 2001), and Mr. Humphrey was recalled to work on August 18, 2002, and is still so employed (Defs.' Joint Mem., App. A, Egeland Aff. ¶ 4). The defendants also argue that there is a conflict on the promotions claim since at least three of the plaintiffs testified that when they bid for promotions, they received them. However, we think that any conflicts of this sort among putative class members could be addressed by subclasses based on the overarching types of discrimination alleged, which would preserve typicality -- but, as we also discussed above, that only would further expose the lack of numerosity here.

*Second*, the defendants argue that there are procedural time bars to some of the named plaintiffs' claims. The defendants point out that some of the named plaintiffs did not file timely charges of discrimination with the EEOC, and others filed charges too late to encompass the plaintiffs' proposed class period. Defendants argue that plaintiffs' earliest EEOC charges are dated August 21, 2001, "which would [not] encompass the broad time-frame posed in [p]laintiffs' proposed class definition," and "at the earliest," would limit "[p]laintiffs' claims . . . to events occurring on or after October 28, 2000" (Defs.' Joint Mem. at 26) -- not January 1999, as the plaintiffs seek for the beginning of the class periods.[11] The defendants also argue that plaintiffs' discrimination claims under 42 U.S.C. § 1981 remain subject to Illinois' two-year personal injury statute of limitations, and thus would be time barred with respect to any events occurring before June

---

[11]Only three of the named plaintiffs filed EEOC charges prior to their termination or layoff: Messrs. Humphrey, Thomas and Theodis Jones, all of whom filed charges on August 21, 2001. Those same three persons also filed retaliation charges on February 1, 2002, within 300 days of their layoffs. Likewise, Messrs. Love (March 13, 2002), Myles (February 7, 2000), Robinson (February 7, 2002), Bobo (January 25, 2002) and Hannah (March 28, 2002) all filed EEOC charges of discrimination and harassment within 300 days after being laid off. Two named plaintiffs failed to file any timely EEOC charge: Devin Baxter, who was terminated May 29, 2000 and filed a charge on February 7, 2002, and Percy Jones, who was terminated in July 2000 and filed a charge on March 8, 2002.

10, 2000 (two years prior to plaintiffs filing the initial complaint in this case). *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999).

We agree that the failure of two named plaintiffs – Messrs. Percy Jones and Baxter – to file timely EEOC charges renders them inadequate representatives on the Title VII claims, although under the "single-filing" rule, it would not bar them from participation as class members were a class to be certified. In *Toney v. Rosewood Care Center, Inc.*, No. 98 C 693, 2001 WL 1105127 at * 3 (N.D. Ill., Sept. 20, 2001), Judge Kennelly wrote:

> Under the "single-filing" rule, which applies to class actions as well as individual suits, *see Romasanta v. United Airlines, Inc.*, 537 F.2d 915, 918-19 & n.7 (7th Cir. 1976), a plaintiff who has neither filed a timely charge with the EEOC nor received a right-to-sue letter – both of which are conditions precedent to seeking judicial relief, *see Wakeen v. Hoffman House, Inc.*, 724 F.2d 1238, 1245 (7th Cir. 1983); 42 U.S.C. § 2000e-5(e), (f)(1), may, nonetheless, under certain circumstances, join a suit initiated by a plaintiff who has satisfied the requirements. *See Zuckerstein v. Argonne National Laboratory*, 663 F. Supp. 569, 572 (N.D. Ill. 1987); *Robinson v. Sheriff of Cook County*, No. 95 C 2205, 1996 WL 417559, at * 1 (N.D. Ill. July 22, 1996). The rule has two requirements: "[f]irst, at least one plaintiff must have timely filed an EEOC complaint that is not otherwise defective" and "[s]econd, the individual claims of the filing and non-filing plaintiffs must have arisen out of similar discriminatory treatment in the same time frame." *Griffin*, 823 F.2d at 1492 (quoting *Jackson v. Seaboard Coast Line R.R.*, 678 F.2d 992, 1011-12 (11th Cir. 1982)).

(certain internal citations omitted). In any event, the absence of Messrs. Percy Jones and Baxter as class representatives on the Title VII clause would still leave eight named-plaintiffs who filed timely EEOC charges.

But, those remaining named plaintiffs indeed cannot represent a Title VII class for any time earlier than October 28, 2000. Under Title VII, an individual has 300 days from the date of the occurrence of the alleged discriminatory act to file a charge of discrimination with the EEOC or a state agency, such as the Illinois Department of Human Rights. *See Binion v. Metropolitan Pier &*

*Exposition Auth.,* 163 F.R.D. 517, 526 (N.D. Ill. 1995). In this case, 300 days prior to August 23, 2001, is October 28, 2000. Thus, the named plaintiffs could not be adequate representatives on Title VII claims extending back to January 1999, as they proposed. While this point would require further constriction of the time period for any Title VII class claims, it would not be a bar to certification.

Finally, plaintiffs say nothing with regard to the Section 1981 statute of limitations issue – no doubt, because there is nothing to say. Plainly, the named plaintiffs cannot represent a Section 1981 class on claims predating June 10, 2000 – and thus, as with the Title VII claims, the named plaintiffs could not represent a Section 1981 class covering the time period they seek. But, again, this consideration alone would not warrant the wholesale denial of certification of any named plaintiff on adequacy grounds.

*Third*, the defendants argue that class counsel is inadequate, because of the numerous inaccuracies in citations in the brief (Defs.' Joint Mem. at 27, and n.12). The Court is concerned by the performance of plaintiffs' counsel in the briefing of this class certification motion. The plaintiffs' counsel has sought certification of classes that cover time frames that are clearly excessive, and for which there is no named plaintiff who could be an adequate class representative. Plaintiffs' counsel has made a completely baseless argument that 178 people could be in the proposed classes, which exceeds by more than five fold the number of African-Americans employed at theChicago facility during any potentially reasonable class period. Then, after retreating from that argument, but in a continued effort to demonstrate numerosity, plaintiffs' counsel has asserted that individuals should be included in a class whom the evidence shows are not African-American (in the case of Eric Hayes); who were not employed at International Paper during the time period urged by the plaintiffs (in the case of James Tate and Anthony House); and who are not identified in any

37

of the documents as ever having been employed by International Paper (in the case of Verona Mitchell). Moreover, in plaintiffs' opening memorandum, plaintiffs' counsel claimed they had not received documents to which they were entitled – and then did nothing about it, at least so far as the Court can see.

That said, we note that it is undisputed that plaintiffs' counsel are experienced in class action matters and have successfully represented plaintiff classes and other employment discrimination cases. The Court is familiar with the work of plaintiffs' counsel work in one of those prior cases, and found it to be more than satisfactory. Moreover, having carefully reviewed the submissions regarding numerosity, we are not persuaded that the quality of the briefing affected the outcome of the motion – if anything, it only obscured the lack of numerosity. Accordingly, while noting the concerns about plaintiffs' counsel's performance in briefing the class issues here, we reject the argument that would render plaintiffs' counsel inadequate – if a class were to be certified.

<h1 style="text-align:center">V.</h1>

We now consider the question of whether plaintiffs have met the requirements of Rule 23(b). The named plaintiffs seek certification under both Rule 23(b)(2) and (b)(3). We address each in turn.

<h2 style="text-align:center">A.</h2>

Rule 23(b)(2) permits certification of a class if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2) is generally "invoked in cases where injunctive or declaratory relief is the primary or exclusive relief sought." *Buycks-Roberson,* 162 F.R.D. at 335. A court considering Rule 23(b)(2) certification must find that the injunctive or declaratory relief is "primary" or "exclusive," because

Rule 23(b)(2) certification creates "binding litigation on all class members without guarantees of personal notice and the opportunity to opt out of the suit." *Lemon v. Int'l Union of Operating Engineers, Local No. 130*, 216 F.3d 577, 580 (7th Cir. 2000). This non opt-out restriction is imposed on the

> presumption that the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among the class members. A suit for money damages, even if the plaintiffs seek uniform, class wide equitable relief as well, jeopardizes that presumption of cohesion and homogeneity because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual's claim. *Lemon,* 216 F.3d at 280. [sic] Thus, class certification of claims seeking monetary relief is not appropriate under Rule 23(b)(2) unless the demand is incidental to the request for equitable relief. *Lemon,* 216 F.3d at 580-81 (adopting Fifth Circuit's definition of "incidental" as "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief" or damage claims that do not depend "in any significant way on the intangible, subjective differences of each class member's circumstances" and do not "require additional hearings to resolve the disparate merits of each individual's case").

*Rahim v. Sheahan,* No. 99 C 0395 2001 WL 1263493, at * 15 (N.D. Ill. Oct. 19, 2001).

In this case, the demand for monetary relief is not "incidental" to the injunctive relief requested. True, the plaintiffs seek to remedy the alleged racially discriminatory policies and practices at International Paper's Chicago facility. But, each class representative seems to have his own story to tell about how the alleged conduct affected him, or others. If this case were to be certified as a class action, any damages the individual plaintiffs and putative class members might recover would need to be addressed with through individual determinations and/or bifurcation of a liability and damages phase. Moreover, the plaintiffs assert punitive damage claims, as well as compensatory damage claims. This Court has previously held that Rule 23(b)(2) certification is not appropriate where this is the case. *Id.* at *16.

## B.

By contrast, Rule 23(b)(3) permits class certification when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This rule requires two findings: predominance of common questions over individual ones, and superiority of the class action mechanism. We have already found that the central and predominant thrust of the plaintiffs' case is that the Chicago facility allowed a racially hostile work place to develop and fester, causing damage to the proposed class members. With respect to commonality and typicality, there are questions of law and/or fact common to the members of the proposed class and these questions predominate over any questions affecting only individual members.

On the issue of whether a class action is superior to other available methods of adjudication, the Court considers the following factors: (a) the interest of the members in the class individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; and (d) the difficulties likely to be encountered in the management of a class action. *See, e.g., Rahim,* 2001 WL 1263493, at * 15. Here, for several reasons, these considerations weigh in favor of denying certification under Rule 23(b)(3).

*First*, we note at the outset that the largest number of members in the class (including the named plaintiffs) would be about 22; nearly half of those people already are joined as named plaintiffs in the case. Given that the Chicago facility is located in this judicial district, any persons

who might wish to file a claim (and would not be time barred from doing so) could do so in this forum. Given the small number of additional people who arguably could comprise a putative class, it would not be impracticable for them to join in one action.

*Second*, given the individual the determinations that would have to be made concerning exposure of unnamed class members to the alleged forms of harassment and discrimination, and the individual damage determinations that would be necessary, there would be little in the way of economy to be achieved by using the class action vehicle.

*Third*, Title VII and Section 1981 claims can, in an appropriate case, lead to the imposition of substantial compensatory and punitive damages (even in the absence of significant actual damages). For this reason, unnamed class members would have a significant interest in controlling the fate of any individual claims they may have. Moreover, denial of class certification would not deprive the named plaintiffs of the ability to seek injunctive and declaratory relief, which is available in individual actions as well as a class action; and, if granted such relief would redound to the benefit of others at the Chicago facility, even without a class action vehicle.

## CONCLUSION

For the reasons given above, the Court respectfully recommends that the district judge deny the plaintiffs' motion for class certification (doc. # 40-1) on the grounds that the numerosity element of Rule 23(a)(1) has not been satisfied and that the class vehicle is not superior to individual determinations. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right

to appeal all findings, factual and legal, made by this Court in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: September _10_ , 2003